**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **8:05CV295** |
| ) | |
| **$14,600.00 IN UNITED STATES CURRENCY,** ) | **MEMORANDUM** |
| ) | **AND ORDER** |
| **Defendant** ) | |
| ) | |
| **AIDA RODRIGUEZ,** ) | |
| ) | |
| **Claimant.** ) | |

This is an action pursuant to 18 U.S.C. § 881 for the forfeiture of $14,600 in United States Currency seized from the residence of the Claimant, Aida Rodriguez, on January 24, 2005. Pursuant to 28 U.S.C. § 636 and the consent of the parties, the matter was tried to the court on January 24, 2006. The final post-trial submission was filed on March 16, 2006, at which time the case was deemed submitted for decision. As discussed below, I find that judgment should be entered in favor of the United States and against the Claimant.

## I. JURISDICTION

This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345, 1355 and 1395, and pursuant to 18 U.S.C. § 881. Venue in this district is proper under 28 U.S.C. § 1391.

## II. FINDINGS OF FACT

1. The defendant property is $14,600.00 in United States Currency. The property was seized within the District of Nebraska and is presently in the District of Nebraska.

2.  Chad Seyler has been employed as a police officer for the City of Grand Island since August 2000. He is assigned to the patrol division, and his duties include taking calls for 911 emergencies, traffic, accident investigation, and a wide variety of matters.

3.  On January 24, 2005, Seyler was working the 7 a.m. to 3 p.m. shift and was driving a police motorcycle. On that day, he stopped the Claimant's husband, Jesus Robles, for a traffic infraction and because Seyler knew Robles' license was suspended. The traffic stop occurred in front of Robles' residence at 1728 South Lincoln. Robles was taken into custody. Officer Doug Whiles, an officer assigned to the traffic division, arrived at about 12:30 p.m. to assist at the scene. Robles' vehicle was searched, and two baggies containing methamphetamine were found in the vehicle.

4.  During the traffic stop, Aida Rodriguez came out of the residence, identified herself as Robles' wife, and wanted to know what was going on. Officer Seyler explained that Robles had been stopped for the traffic violation and he was going to jail. This conversation was conducted in the English language.

5.  Officer Whiles continued to speak with Aida Rodriguez, asking her whether there were any more drugs inside the house. She said there were none that she knew of. He then asked her if she would mind of the officers searched the residence. Rodriguez said she wouldn't mind, and gave verbal consent to search the residence. Both Whiles and Rodriguez spoke English during this conversation.

6.  Whiles contacted Sergeant Church to help conduct the search. Although Ms. Rodriguez had given verbal permission to search, Whiles also contacted Investigator Duering for a consent to search form. Whiles also advised Officer Seyler that Ms. Rodriguez had verbally consented to their searching the residence. All conversations relating to the consent were conducted in English.

7. Officer Seyler completed the consent to search form in the presence of Aida Rodriguez and Investigator Duering. Seyler read her the form in English and asked her if she understood. Rodriguez said yes, she could understand, and signed the consent form (Ex. 1).

8. The parties agree that Aida Rodriguez' consent was valid, and Rodriguez does not contest the validity of the search of the residence.

9. Aida Rodriguez was inside the residence during the search. Officer Seyler participated in the search of the residence and seized the subject $14,600, which he found in a black leather camera case inside the pocket of a black leather jacket located in a closet in the master bedroom. In response to Seyler's inquiry, Rodriguez said that the jacket belonged to her husband, Jesus. When Seyler showed Rodriguez the camera case and asked her if she knew what was inside, she said she thought it was a camera. Seyler then advised her there was money in the camera case.

10. In response to Seyler's questions, Rodriguez advised that she and her husband had jobs at Swift and ConAgra and they had a bank account where they deposited their paychecks; however, the account contained only $30 to $40 at the time. All the conversations between Officer Seyler and Aida Rodriguez on January 24, 2005 were conducted in English.

11. Nebraska State Patrol Investigator Steven Kolb assisted in the search of the residence, and spoke to Aida Rodriguez during that time. Both Kolb and Rodriguez spoke in English. After Rodriguez told Officer Seyler she did not know where the money came from, Kolb said to her, "You're his wife, how did you not know that there was money in the bedroom?" She replied that lately she did not know what her husband was doing; there were problems in the marriage. Kolb did overhear Rodriguez speaking to someone in Spanish on the telephone.

12. The officers seized money, drug paraphernalia, scales, pipes, surveillance cameras, silver bars, and other items from the residence.

13. Investigator Tony Keiper did not participate in the traffic stop or the search of the residence on January 24, 2005. He was advised of those events and contacted Aida Rodriguez to schedule an interview to discuss the $14,600 that was seized on January 24. On February 16, 2005, Lawrence Sattley, a special agent with Immigration and Customs Enforcement (ICE) was called to assist Keiper in interviewing Aida Rodriguez. Sattley is proficient in the Spanish language and was asked to serve as an interpreter, if necessary.

14. Keiper interviewed Rodriguez on February 16, 2005 with Agent Sattley at the ICE office in Grand Island. The interview was conducted in English, and Rodriguez responded and talked to Keiper in the English language. Sattley's interpreting skills were not required during the approximately 90-minute interview. During the interview, Rodriguez was cooperative and did not appear to be under the influence of alcohol, narcotics, or controlled substances.

15. During the February 16, 2005 interview, Keiper told Rodriguez he was not interviewing her about Jesus Robles' drug activities or accusing her of that; it was an investigation to find out what she knew about the $14,600 and their family's financial situation. Rodriguez told Keiper she had no knowledge of the $14,600 and did not even know it was in the residence. At that time, Rodriguez and Robles were still living together as husband and wife.

16. Keiper attempted to establish a monthly cash flow statement from Rodriguez. She was asked to itemize her monthly expenditures and income, and Keiper determined that there was a surplus of about $238 each month. When asked about the surplus, Rodriguez stated that, at the end of each week, she might have an extra $20 bill. Rodriguez stated that her husband, Jesus Robles,

had been employed at Swift until approximately June 2004, when they took a two-week family vacation to Phoenix, Arizona. Robles contributed about $350 per week to the family budget until June 2004. Rodriguez told Keiper they had been able to save some money, and the family vacation was financed by withdrawing $4,000 from their bank account. After the vacation, about $500 remained in the bank account.

17. Rodriguez told Keiper that Jesus Robles had no job when they returned from vacation, and he could not contribute the customary $350 per week toward household expenses. He did give Rodriguez between $250 and $300 per month for a car payment, but Rodriguez paid the other bills on her own. She said she believed Robles was able to give her $250 to $300 per month, even though he was unemployed, because he was repairing car stereos. Rodriguez told Keiper she had no other assets and had recently charged $1,000 to a credit card to buy clothes and Christmas presents for the children because she did not have any money.

18. Rodriguez testified she has lived in Grand Island since 1992 and has been continuously employed since that time, except for the times she was having her three children. For the past three years, she has worked at ConAgra in Hastings, Nebraska. She testified at trial that since 1992, she and her husband "had gotten some money together" and had received $36,729 in income tax refunds since 1992.

19. Rodriguez recalled speaking to police officers on the day of Robles' arrest and testified that she could understand and speak "a little bit" of English, "but not a hundred percent for purposes of a conversation."[1]

---

[1] Rodriguez used a Spanish language interpreter at trial.

20. Rodriguez testified that during the search of her residence, an officer who told her he was Puerto Rican questioned her in Spanish. According to Rodriguez, she did not know what to say about the presence of the $14,600, as drug-related items had been found in the house; she was afraid the officers would think she was involved with drugs.

21. Rodriguez further testified that she spoke Spanish in her interview with Keiper, using an interpreter. Although Keiper told her they did not suspect her of drug activity, she did not know for sure whether that was true.

22. Jesus Robles left the household around March 28, 2005, after drug charges were filed against him in state court. Those charges are still pending, and Robles is a fugitive.

23. Rodriguez testified on cross-examination that the $14,600 found in her husband's jacket came from their tax refunds.

24. The federal and state income tax returns filed by Robles and Rodriguez for tax years 1992, 1994, 1995, 1996, 1997, 1998, 2002, 2003 and 2004 (Exhibits 3, 4, 5, 6, 7, 8, 10, 11, and 12) give Rodriguez' occupation as "housewife" or "unemployed," for 1994, 1995, 1996 and 2002. No information as to Rodriguez' occupation was disclosed on the tax forms for years 1997 and 1998. The 2003 and 2004 tax forms identify Rodriguez' occupation as "laborer." Only Robles' W-2 forms are attached to the exhibits.

25. During the tax years reflected in the trial exhibits, Robles and Rodriguez claimed a total of $28,881 in tax refunds. Rodriguez testified that, over the years, she and her husband saved approximately $15,000 of their tax refund money and kept the cash in the black jacket. They cashed the first refund checks at Western Union. They opened a bank account in 1996 so they could cash checks. According to Rodriguez, they would cash the checks and keep the cash at the house, not in

the bank, and they paid their bills in cash.  She testified that they only kept $100 in their bank account, which was a minimum requirement to cash checks, and that the $4,000 for the family vacation to Phoenix came from their tax refund money.  Rodriguez testified that she elected to charge $1,000 to her credit card instead of using cash from the black jacket because they were trying to save $30,000 to go back to Mexico.

### III.  CONCLUSIONS OF LAW

The statutory bases for this lawsuit are 21 U.S.C. § 881 and 18 U.S.C. § 983.  Section 881(a)(6) authorizes the forfeiture to the United States of "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."

Section 983 governs the burden of proof in this matter:

> (c)  In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property–
>
> (1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture; [and]
> * * * *
> (3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.

"Thus, the United States bears the initial burden of establishing by a preponderance of the evidence that the property is substantially connected to drug trafficking.... Circumstantial evidence can be used by the United States to establish its burden of proof."  *United States v. $84,615 in United States*

*Currency*, 379 F.3d 496, 501 (8th Cir. 2004) (citing *United States v. $10,700 in United States Currency,* 258 F.3d 215, 224 n.6 (3d Cir. 2001)). *See also United States v. $117,920 in United States Currency*, 413 F.3d 826, 829 (8th Cir. 2005). "In a forfeiture trial the government does not have to show evidence of, or trace the money to, a particular narcotics transaction." *United States v. $150,660 in United States Currency*, 980 F.2d 1200, 1205 (8th Cir. 1992); *see also United States v. $10,700 in United States Currency*, 258 F.3d 215, 225 (3d Cir. 2001). The Eighth Circuit has also recognized that possession of a large amount of cash is strong evidence that the cash is connected with drug activity. *United States v. $84,615*, 379 F.3d at 501-502; *United States v. $117,920*, 413 F.3d at 829.

The government has shown that, on January 24, 2005, the Claimant's husband, Jose Robles, was stopped for traffic violations outside the residence he and the Claimant occupied in Grand Island, Nebraska. Robles was arrested and his vehicle was searched, at which time police officers found two plastic bags containing over 16 grams of methamphetamine (31:14-21). The Claimant, Aida Rodriguez, was present and gave officers permission to search the residence. She does not contest the legality of the search. The defendant property, $14,600 in cash, was found concealed in a camera case inside Mr. Robles' black leather jacket hanging in the back of the closet in the master bedroom. Officers also found drug paraphernalia in the residence, including scales and pipes. When asked by officers about the money found in the camera case, Ms. Rodriguez denied knowledge of it and ownership of it (1) on January 24, 2005, and (2) on February 16, 2005. Mr. Robles is currently a fugitive from justice. Based on these circumstances, I find that the United States has shown, by a preponderance of the evidence, the defendant property is substantially connected to drug trafficking.

Since the United States has met its burden in establishing a substantial connection between the $14,600 and drug trafficking, the burden shifts to the Claimant to refute the government's case by proving that she is an "innocent owner" of the property. *See United States v. 392 Lexington Parkway S.*, 386 F. Supp. 2d 1062, 1066-67 (D. Minn. 2005). In this regard, 18 U.S.C. 983(d)(1) provides, "An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute." The Claimant bears the burden of proving by a preponderance that she is an innocent owner. *Id.* The term "owner" does not include "a nominee who exercises no dominion or control over the property." § 983(d)(6)(B)(iii).

The statute requires the Claimant to prove, (1) she had an ownership interest in the property, and (2) she did not know of the conduct giving rise to forfeiture, or, upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property. § 983(d)(2)(A)(i) & (ii).

As to Aida Rodriguez' innocent owner defense, the issue presented is whether Rodriguez has proven by a preponderance of the evidence that she was an owner of the $14,600. When the money was found on January 24, 2005, Rodriguez said she did not know of its existence and stated that it was not hers.[2] During her interview on February 16, 2005 with Officer Keiper, Rodriguez once again stated that she had no knowledge of the $14,600 and did not even know it was in the residence. Rodriguez was told, and understood, that she was not being investigated for drug-related offenses.

---

[2]Although some question has been raised as to Rodriguez' proficiency in English, I credit the officers' testimony that Rodriguez had no difficulty whatsoever understanding their conversations, which were all conducted in English without the actual assistance of a Spanish language interpreter. In light of the Claimant's presence and employment in or near Grand Island, Nebraska for the past 14 years, her testimony does not tend to support an inference that she does not understand conversational English.

During these conversations, Rodriguez knew what was being asked, and on both occasions denied any knowledge or ownership of the $14,600.

Despite her complete disavowal of any knowledge of or ownership interest in the subject currency, Rodriguez filed this claim in March 2005 (*see* Filing 8, VERIFIED ANSWER AND COUNTERCLAIM), stating for the first time that the $14,600 was derived from family earnings, i.e., income tax refunds she and Robles received between 1992 and 2004. I do not find this explanation to be credible, particularly in light of the governments' witnesses' credible testimony that Rodriguez said she did not even know there was money hidden in the camera case found in the pocket of her husband's jacket. She could have offered the "tax refund" explanation to Officer Keiper, but did not do so, even knowing that she was not suspected of drug trafficking. Instead, she told Keiper that she had no extra money and had, in fact, charged $1,000 on a credit card for clothes and Christmas presents for the children. Rodriguez' statements of January 24 and February 16, 2005 cannot be reconciled with her trial testimony to the effect that she and her husband saved about half of their income tax refunds each year and had been hiding the cash in the black leather jacket since 1992.

Based on the evidentiary record, and my assessments of the witnesses' credibility, it seems quite likely that the $14,600 found in the pocket of Robles' jacket belonged to Robles and was derived from drug trafficking, and was not derived from the couple's income tax refunds. Consequently, I find that the government has shown, by a preponderance of the evidence, that the defendant property is substantially connected to drug trafficking and the Claimant has not shown by a preponderance of the evidence that she was an owner of the subject currency.

## DECISION

For the reasons explained above, the court finds that the defendant currency should be forfeited to the United States and judgment should be entered in favor of the plaintiff and against the Claimant, Aida Rodriguez.

A separate judgment will be entered contemporaneously with this Memorandum and Order.

**DATED April 18, 2006.**

        **BY THE COURT:**

        **s/ F.A. Gossett**
        **United States Magistrate Judge**